IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PHYLLIS BAKER,                    )
                                 )
v.                               )          No. 3:14-1240
                                 )
CAROLYN W. COLVIN,               )
        Acting Commissioner of   )
        Social Security          )

To: The Honorable Aleta A. Trauger, District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g) and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 14) should be DENIED.

## I. INTRODUCTION

In June 2010, the plaintiff protectively filed for SSI and DIB, alleging a disability onset date of April 1, 2008, due to bipolar disorder, obesity, and problems with her knees and back. (Tr. 11, 147-52, 163, 167.) Her applications were denied initially and upon reconsideration. (Tr. 83-88, 95-

100.)  The plaintiff appeared and testified at a hearing before Administrative Law Judge Frank Gregori ("ALJ") on October 18, 2012 (tr. 31-78), and on December 7, 2012, the ALJ entered an unfavorable decision.  (Tr. 11-23.)  On March 27, 2014, the Appeals Council denied the plaintiff's request for review of the hearing decision, thereby making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

## II. BACKGROUND

The plaintiff was born on September 28, 1964, and she was 43 years old as of her alleged disability onset date.  (Tr. 41.)  She attended college but did not graduate and has worked as a cashier and factory worker.  (Tr. 42-48, 68-69.)

### A. Chronological Background: Procedural Developments and Medical Records

From February to September 2010, the plaintiff was treated by Dr. Michael Rhodes for a number of ailments including bilateral knee pain, low back pain, muscle spasms, hypertension, morbid obesity, and attention deficit hyperactivity disorder ("ADHD").  (Tr. 243-79.)  Dr. Rhodes prescribed, *inter alia*, Adderall, Ambien, Celexa, Lortab, Seroquel, and Soma.[1]  *Id.*  On February 18, 2010, the plaintiff went to an emergency room reporting that Dr. Rhodes had told her that she needed a blood transfusion.  (Tr. 213-39.)  She was diagnosed with anemia secondary to blood loss,

---

[1]  Adderall is a central nervous system stimulant for ADHD, narcolepsy, and obesity. Saunders Pharmaceutical Word Book 12 (2009) ("Saunders").  Ambien is a sedative and hypnotic for the short-term treatment of insomnia.  *Id.* at 37.  Celexa is a selective serotonin reuptake inhibitor ("SSRI") for depression, obsessive compulsive disorder, post-traumatic stress disorder, generalized anxiety disorder, and premenstrual dysphoric disorder.  *Id.* at 141-42.  Lortab is a narcotic analgesic. *Id.* at 415.  Seroquel is an antipsychotic for schizophrenia and both manic and depressive episodes of a bipolar disorder.  *Id.* at 639.  Soma is a skeletal muscle relaxant.  *Id.* at 653.

B12 deficiency, iron deficiency, hypertension, and chronic pain problems. (Tr. 213.) She was given vitamin B12 and a blood transfusion and discharged in stable condition on February 22, 2010. *Id.*

The plaintiff presented to Centerstone Community Mental Health Care Center ("Centerstone") on April 15, 2010, where she was evaluated by John Demarco, M.A. (Tr. 327-33.) The plaintiff reported that she was homeless, had attempted suicide in the past, and had a history of substance abuse. (Tr. 327, 329-30.) She denied that she was currently using drugs or alcohol and reported that she was in full sustained remission. (Tr. 329-30.) She reported that her symptoms included irritability, "crying spells, poor sleep because of worrisome thoughts, poor self-image, [and] lack of energy, motivation, and hope." (Tr. 330.) Mr. Demarco diagnosed her with alcohol and cocaine dependence and noted that her presentation was consistent with depressive disorder, not otherwise specified ("NOS"). (Tr. 331-32.) He also completed a Tennessee Clinically Related Group ("CRG") Form in which he assigned the plaintiff a Global Assessment of Functioning ("GAF") score of 41[2] and opined that she had moderate limitations in the areas of activities of daily living and maintaining concentration, task performance, and pace as well as marked limitations in the areas of interpersonal functioning and adaptation to change. (Tr. 323-24, 411.)

The plaintiff continued mental health treatment at Centerstone from April 2010 until April 2011. (Tr. 326, 334-411.) She frequently cancelled or missed scheduled appointments. (Tr. 345, 348, 351, 353-54, 363, 373, 376, 379, 386-88, 407-08.) In June 2010, she reported that she had not used marijuana or cocaine since 2007 and had approximately one drink of alcohol per month.

---

[2] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

(Tr. 338.)  She reported that she had attempted suicide three times.  (Tr. 339.)  She was diagnosed with bipolar I disorder, most recent episode mixed, severe without psychotic features; cocaine dependence; and alcohol dependence; and she was prescribed Risperdal.[3]  (Tr. 339-40.)  In October 2010, she reported that she "might have to start looking for some type of work" but that she "[did] not want to risk the chance of messing up her chances for her disability."  (Tr. 364.)  In December 2010, she reported that she had applied for jobs but "ha[d] not heard from anyone."  (Tr. 355.)  At that time, she was taken off Risperdal and started on Fanapt.[4]  (Tr. 357-58.)

On December 21, 2010, Dr. Lloyd Huang, a Tennessee Disability Determination Services ("DDS") consultative physician, physically examined the plaintiff.  (Tr. 280-83.)  The plaintiff complained of a history of chronic low back pain and knee pain that had started one or two years earlier.  (Tr. 280.)  She rated her back pain as an 8 out of 10 on the pain scale and described it as "aching pain without radiation."  *Id.*  She told Dr. Huang that she had "daily bilateral knee pain" and that her knees "give out at times."  *Id.*  She related that she had gastric bypass surgery in 2004 and had been hospitalized with "severe anemia."  *Id.*  She denied using alcohol.  *Id.*

Dr. Huang noted that the plaintiff was 5'10" tall and weighed 348 pounds.  (Tr. 281.)  Upon physical examination, she had normal range of motion in her cervical spine, shoulders, elbows, wrists, hips, knees, and ankles with normal handgrip strength and negative straight leg raises to 60 degrees.  *Id.*  Her lumbar spine extension was 20 degrees with flexion to 80 degrees.  *Id.*  She had normal range of motion of the right knee with mild crepitus and, in her left knee, she had normal

---

[3] Risperdal is an antipsychotic for schizophrenia, manic episodes of a bipolar disorder, autism, obsessive compulsive disorder, and Tourette syndrome.  Saunders at 618.

[4] Fanapt (iloperidone) is a selective serotonin and dopamine antagonist for schizophrenia. Saunders at 363.

extension with flexion reduced to 90 degrees.  *Id.*  Dr. Huang observed that she was able to get on and off the exam table without difficulty, ambulated with a "minimal" limp, and was able to perform the squat-and-rise maneuver with moderate difficulty.  *Id.*  X-rays of her lumbar spine showed "[m]ild degenerative disc disease, primarily at L5-S1," and an x-ray of her left knee showed "[s]evere degenerative joint disease."  (Tr. 282.)

Dr. Huang diagnosed the plaintiff with "[m]assive morbid obesity;" "[s]tatus post gastric bypass;" "[m]alabsorption syndrome with resultant B12 and iron-deficiency anemia;" "[l]ow back pain, mild degenerative disc disease;" "[d]egenerative joint disease of the knees, severe;" and "[b]ipolar affective disorder."  *Id.*  He opined that the severe degenerative joint disease of her knees was "related to her morbid obesity" and that "[h]er gastric bypass appear[ed] to be complicated by malabsorption resulting in anemia, which should be correctible [*sic*] with medication."  *Id.*  He opined that she could lift twenty pounds occasionally and ten pounds frequently, stand and walk for 3-4 hours in an eight-hour workday, and sit five hours in an eight-hour workday, and he added that "[p]erhaps vocational rehabilitation or educational opportunities for sedentary work would be helpful."  *Id.*

On January 3, 2011, Dr. Thomas Pettigrew, Ed. D., performed a psychological evaluation of the plaintiff.  (Tr. 284-87.)  The plaintiff alleged that she was disabled due to bipolar disorder and attention deficit disorder ("ADD").  (Tr. 284.)  Dr. Pettigrew noted the plaintiff's height and weight and observed that she was "casually dressed, cleaned and well-groomed."  *Id.*  He observed that she "exhibited no pain behavior and maintained a stable and euthymic affect" throughout the evaluation.  *Id.*  The plaintiff reported that her previous jobs were "factory work" and that she last worked in 2008.  *Id.*  She said that she stopped working because she was "not able to stand up and do that work

and . . . can't deal with the people." *Id.* She also reported that she was "angry all the time," and experienced panic attacks. (Tr. 285.) Dr. Pettigrew observed that, when asked to describe her psychological symptoms, the plaintiff "responded in a rather flippant manner, 'ah panic attacks and I stay angry and I hear voices. I am just crazy!'" *Id.* When asked whether her condition improved or worsened from time to time, the plaintiff responded that, "I don't have no energy and I don't want to do nothing. I just sit!" *Id.* She told Dr. Pettigrew that she did not drink alcohol except "maybe" on a holiday because she did not "like the taste of alcohol," and she "denied that she ha[d] ever used or experimented with any illegal drug." *Id.*

During a mental status examination, the plaintiff "maintained a composed demeanor and euthymic affect." *Id.* She was alert and oriented, and her speech was "clearly articulated and fluent without pressured speech, flight of ideas, grandiosity or tangentiality." *Id.* Her thought was "linear and organized with no bizarre, unusual or delusional content." *Id.* Her affect was "stable without tearing, overt crying, irritability, lability or anger," and she demonstrated no signs of mania or agitation. (Tr. 286.) Dr. Pettigrew observed that her answers to questions "revealed consistently adequate comprehension and ability to develop, organize and express her thought[s]." She demonstrated intact memory, average attention, and average concentration, and she was able to solve mental calculations effectively.

The plaintiff told Dr. Pettigrew that she lived with her mother and 18-year-old son and that she was able to bathe, dress, and groom herself as well as drive, shop, manage money, and wash laundry and dishes. *Id.* She said that her mother usually went shopping with her and that she attended church and watched television. *Id.* Dr. Pettigrew opined that the plaintiff was in the

borderline range of intelligence with an IQ of 71-84 and had "no specific cognitive deficits." *Id.*

He did not give a mental diagnosis but opined that:

> [The plaintiff] is able to understand, remember and carryout [*sic*] simple verbal instructions. She appeared composed throughout the interview and showed no signs of anxiety, depression, hyperactivity, distractibility, mania, agitation or any form of psychosis. Her receptive and expressive language skills are adequate. She tolerated the examination process well and maintained socially appropriate behavior. She is considered capable of managing disability funds.

*Id.*

On January 24, 2011, Dr. Edward Sachs, Ph.D., a nonexamining DDS psychological consultant, completed a Psychiatric Review Technique ("PRT"). (Tr. 288-301.) Dr. Sachs found that the plaintiff had ADHD, which was treated with Adderall (tr. 289), and opined that she experienced mild functional limitations in the areas of the activities of daily living; maintaining social functioning; and maintaining concentration, persistence or pace; with no episodes of decompensation.[5] (Tr. 298.)

On February 2, 2011, a nonexamining DDS medical consultant completed a physical Residual Functional Capacity ("RFC") assessment (tr. 302-11) and opined that the plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk four hours in an eight-hour workday, sit about six hours in an eight-hour workday, and occasionally push and/or pull with her left lower extremity. (Tr. 303.) The consultant opined that the plaintiff could never

---

[5] On June 16, 2011, Dr. Thomas Neilson, Psy.D., a nonexamining DDS psychological consultant, "affirmed" Dr. Sach's assessment. (Tr. 314.)

climb ladders, ropes, or scaffolds and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.[6] (Tr. 304.)

In March 2011, the plaintiff told her case manager at Centerstone that she no longer needed case management. (Tr. 350.) In April, she reported that Fanapt "was good" but that she had run out of medication a couple of months prior and had "a tendency to stop taking meds when she start[ed] feeling better." (Tr. 346.) She said that she "plan[ned] to [continue] meds from now on" and that she "felt more stable while taking [F]anapt." *Id.* On July 11, 2011, the plaintiff was discharged from Centerstone due to a lapse in service. (Tr. 344.) At the time of her discharge, her diagnosis was bipolar I disorder, most recent episode mixed, severe without psychotic features, and alcohol dependence. (Tr. 326.) Her assigned GAF score remained 41. *Id.*

### B. Hearing Testimony

At the hearing on October 18, 2012, the plaintiff was represented by counsel, and the plaintiff and a vocational expert ("VE"), Pedro Roman, testified. (Tr. 31-78.) The plaintiff testified that she is 5'10" tall and weighs 338 pounds. (Tr. 52.) She said that she is able to drive but that her driver's license was suspended for non-payment of traffic tickets. (Tr. 53.) She testified that she attended college but did not graduate and has not worked since 2008. (Tr. 42-43.) She reported that she had worked several different times at an electronics factory where she tested stoves on an assembly line. (Tr. 43-48.) She said that, on one occasion, she stopped working after she "passed out" while working on the assembly line and that, on a different occasion, she was let go due to lack of work.

---

[6] On June 15, 2011, Dr. Janet Pelmore, a nonexamining DDS consultative physician, "affirmed" this prior RFC assessment after determining that the plaintiff's impairments had not changed. (Tr. 312.)

(Tr. 45-47.) She said that she also worked in quality control at an electronics factory and as a fast-food restaurant cashier. (Tr. 47-48.) She also recounted that she once took care of a family friend who was ill for approximately three weeks. (Tr. 62.)

The plaintiff testified that she cannot work due to pain in her knees, legs, and back. (Tr. 50.) She said that her knees hurt due to her weight and that it hurts to stand for long periods of time. (Tr. 50, 57.) She said that her left knee was "worse" than her right knee and "gives out" and that she also has pain in her left foot "continuously." (Tr. 50-51, 57.) She said that her back pain starts in her low back and goes down her left leg into the heel of her left foot. (Tr. 58.) She also said that she has muscle spasms in her legs and back and has difficulty walking up and down stairs. (Tr. 58-59.) She estimated that she can sit for 15-20 minutes before needing to stand up, walk for five minutes at a time, and stand for ten minutes before needing to sit down. (Tr. 60-61.)

The plaintiff testified that she also experiences panic attacks, anxiety, mood swings, and irritability. (Tr. 62-63.) She said that she is "irritable a lot" and feels like she "want[s] to be dead." *Id.* She said that she lies in bed in pain "most every day" and frequently isolates herself from her family. (Tr. 63.) She explained that she "feel[s] like . . . a burden because [she] can't get up and do what everybody else [does]." *Id.* She testified that she no longer goes to Centerstone because she does not have insurance. (Tr. 52.) She said that, when she was being treated at Centerstone, she frequently missed appointments because she "just didn't feel like getting up out of the bed." (Tr. 61.) She indicated that she takes Ibuprofen and blood pressure medication but previously took Adderall, Lortab, Soma, Ambien, and Seroquel, although she can longer afford these medicines without insurance. (Tr. 49-50, 59.)

The ALJ asked the plaintiff why she told Dr. Huang that she did not use alcohol, and she

replied:

> Well, because I really don't just use alcohol. When you go to treatment they want
> you to say – to get in there you got to really have a bad problem, so I just told them
> that I had a bad problem with alcohol, which it really wasn't alcohol. It was the
> cocaine.

(Tr. 54.) The ALJ then asked whether she had denied using drugs and alcohol to Dr. Pettigrew. She

replied:

> A: Yes I did, because at the time I wasn't having a problem with that.
> Q: But you told Dr. Pettigrew you've never used drugs or alcohol.
> A: Yes, and –
> Q: Is that true?
> A: Yes it's true.
> Q: Why did you lie to Dr. Pettigrew?
> A: I was just scared and nervous, I –
> Q: All right, can you prove or demonstrate that you're not currently using crack
> cocaine or alcohol?
> A: Yes.
> Q: How?
> A: I can give you a drug test.
> Q: Have you – all right, have you been tested at the county health department or at
> Centerstone for drugs and alcohol?
> A: No.
> Q: Have they taken any blood or urine to screen for drugs and alcohol?
> A: No.
> Q: Are you still using crack cocaine?
> A: No, sir.
> Q: When was the last time you used any crack cocaine?
> A: It's been about a year and maybe a month. I stopped last year, 2011, in
> September.
> Q: What about alcohol? When was the last time you drank any alcohol?
> A: Well, I guess I could say maybe two weeks ago I had just a drink. We went out
> to dinner for my birthday. My mom and my sister took me out. And I had a
> margarita; just one.

(Tr. 54-55.)

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles and classified the plaintiff's past job as an electronics worker as light with a Specific Vocational Preparation ("SVP") level of 2, her past job as a cashier as light with a SVP level of 2, and her past job as an electronics inspector as light with an SVP level of 6.[7] (Tr. 68-69.) The ALJ asked whether a hypothetical person would be able to obtain work if she were able to lift and carry up to twenty pounds occasionally and ten pounds frequently; push and/or pull to the same weights; stand and/or walk for no more than four hours in an eight-hour workday; operate foot controls with the left lower extremity occasionally; never climb ropes, ladders, or scaffolding; and occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 69-70.) The VE testified that a person with those limitations could perform the plaintiff's past relevant work as an electronics inspector, electronics worker, or cashier and could also work in representative occupations as a finisher, inspector/hand packager, pricing tagger, and small parts assembler. (Tr. 70-73.) The VE testified that the availability of all of these jobs would be reduced by 30% to account for the need for a sit/stand option. *Id.*

As a second hypothetical question, the ALJ asked whether a person would be able to obtain work if she could only perform sedentary work, needed to alternate between sitting and standing every 45 minutes, could not crawl, could rarely kneel or climb stairs, could only occasionally bend and squat, and could never climb ropes, ladders, or scaffolds. (Tr. 74.) The VE testified that a person with these limitations could not perform the plaintiff's past relevant work but could work as

---

[7] The SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." U.S. Dep't of Labor, DOT 1009 (4th ed. rev. 1991). It is measured on a scale from 1-9 on which the higher number assigned to a job, the greater the skill that is required to perform that job. *Id.* Unskilled work has an SVP level of 1-2; semi-skilled work has an SVP level of 3-4; and skilled work has an SVP level of 5-9. *See* Soc. Sec. Rul. 00-4p, 2000 WL 1898704, at *3.

an assembler, charge account clerk, and telephone quotation clerk. (Tr. 74-75.) In response to questioning by the plaintiff's attorney, the VE testified that, if a person were unable to respond appropriately to usual work situations and changes in the workplace, it would have a "serious impact" on her ability to perform these jobs and that a person who needed to take 2-3 additional, unscheduled, ten minute breaks would not be able to obtain any work. (Tr. 75-76.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on December 7, 2012. (Tr. 11-23.) Based upon the record, the ALJ made the following findings:

1.  The claimant met the insured status requirements of the Social Security Act through September 30, 2012.

2.  The claimant has not engaged in substantial gainful activity since April 1, 2008, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

\*\*\*

3.  The claimant has the following severe impairments: iron deficiency, anemia, B12 deficiency, hypertension, morbid obesity, degenerative joint disease of the knees, and polysubstance dependence (20 CFR 404.1520(c) and 416.920(c)).

\*\*\*

4.  The claimant's impairments, including the substance use disorder, meet sections, 12.04, and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

\*\*\*

5.  If the claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.

\*\*\*

6.      If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

\*\*\*

7.      If the claimant permanently stopped all substance use, the claimant would have the residual functional capacity to perform some light work, as defined in 20 CFR 404.1567(b) and 416.967(b), as follows: she can lift 20 pounds occasionally and ten pounds frequently. She can push or pull the same weights, but she can only operate foot controls with the left lower extremity only occasionally. She can stand and/or walk for a total of no more than four hours in an eight-hour workday. She can sit for 6 hours in an 8-hour workday. She can never climb ladders, ropes, or scaffolds. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.

\*\*\*

8.      If the claimant stopped the substance use, the claimant would be able to perform past relevant work as an electronics worker, cashier, and electronics inspector. This work does not require the performance of work-related activities precluded by the residual functional capacity the claimant would have if she stopped the substance use (20 CFR 404.1565 and 416.965).

\*\*\*

9.      The substance use disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if she stopped the substance use (20 CFR 404.1520(f), 404.1535, 416.920(f) and 416.935). Because the substance use disorder is a contributing factor material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

(Tr. 13-22.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial

evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot*

*v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [her] impairments and the fact that [she] is precluded from performing [her] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden of production shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See*

16

*also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step four of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her alleged disability onset date. (Tr. 14.) At step two, the ALJ determined that the plaintiff had the following severe impairments: "iron deficiency, anemia, B12 deficiency, hypertension, morbid

obesity, degenerative joint disease of the knees, and polysubstance dependence." *Id.* At step three, the ALJ found that the plaintiff's mental impairments, including the substance use disorder, met sections 12.04 and 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-15.) However, the ALJ determined that, if the plaintiff stopped the substance use, her mental impairment would no longer be severe and she would no longer meet any listed impairment. (Tr. 15-16.) At step four, the ALJ determined that, if the plaintiff stopped the substance use, she would be capable of performing her past relevant work as an electronics worker, cashier, and electronics inspector. (Tr. 21-22.) The ALJ also made an alternative finding at step five that the plaintiff could work as a finisher, price tagger, and small products assembler. *Id.*

### C. The Plaintiff's Assertions of Error

The plaintiff argues that the ALJ erred by: (1) failing to properly consider her lumbar impairment at step two of the five-step process; (2) finding that her substance use disorder was a contributing factor material to the determination of disability; and (3) failing to properly consider her obesity. Docket Entry No. 14-1, at 5-13.

### 1. The ALJ's failure to consider the plaintiff's lumbar impairment at step two was harmless error.

The plaintiff argues that the ALJ erred by failing to consider her lumbar impairment at step two. Docket Entry No. 14-1, at 5-6. The plaintiff notes that an x-ray of her lumbar spine showed disc space narrowing, most prominently at L5-SI (tr. 282), and she contends that the ALJ should

have included this impairment as a severe impairment at step two or else explained why he did not do so. *Id.*

If an ALJ fails to address a certain impairment at step two, "the error is harmless as long as the ALJ found at least one severe impairment and continued the sequential analysis and ultimately addressed all of the [plaintiff's] impairments in determining her residual functional capacity." *Swartz v. Barnhart*, 188 Fed. Appx. 361, 368 (6th Cir. July 13, 2006) (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). *See also Fisk v. Astrue*, 253 Fed. Appx. 580, 583 (6th Cir. Nov. 9, 2007) (An ALJ's failure to find an impairment severe at step two is not reversible error if the ALJ "considers all of a claimant's impairments in the remaining steps of the disability determination.); 20 C.F.R. § 404.1523 (When making a disability determination, the Regulations require that if one severe impairment exists, the Commissioner "will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.").

In this case, the ALJ found that the plaintiff had several severe impairments and went on to consider the plaintiff's asserted lumbar impairment when determining her RFC. Specifically, the ALJ discussed the x-ray showing disc space narrowing, Dr. Huang's exam findings showing limited range of motion of the lumbar spine, and Dr. Huang's diagnosis of mild degenerative disc disease. (Tr. 18, 20.) The ALJ gave significant weight to Dr. Huang's opinion finding limitations related to a lumbar impairment, and, indeed, the ALJ's RFC determination substantially incorporates Dr. Huang's opinion. (Tr. 16, 18, 20.) Given the ALJ's consideration of the plaintiff's lumbar impairment in determining her RFC, the Court concludes that it was harmless error for the ALJ to fail to address the plaintiff's alleged lumbar impairment at step two.

## 2. The ALJ did not err in evaluating the plaintiff's substance use disorder.

The plaintiff argues that the ALJ erred by finding that her substance use disorder was a contributing factor material to the determination of disability. Docket Entry No. 14-1, at 6-12. Specifically, the plaintiff argues that this finding is not supported by substantial evidence in the record and that the ALJ failed to properly consider contrary evidence that the plaintiff was in full sustained remission from substance use. *Id.*

A claimant cannot receive disability benefits if alcohol or drug abuse is a material contributing factor to the finding of disability. 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."). In order for this condition to apply, the ALJ must determine whether the plaintiff would still be disabled if she stopped using drugs and alcohol. 20 C.F.R. §§ 404.1535, 416.935. Sections 404.1535 and 416.935 require that the five step sequential evaluation process, found in 20 C.F.R. § 404.1520, be followed in the adjudication of disability "before any consideration is given to whether drug addiction [or alcohol abuse] is the cause of such disability." *Williams v. Barnhart*, 338 F. Supp. 2d 849, 862 (M.D. Tenn. 2004) (Wiseman, J.) (adopting Report and Recommendation) (citing *Drapeau v. Massanari*, 255 F.3d 1211, 1214-15 (10th Cir. 2001)). *See also Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003); *Wilby v. Astrue*, 2010 WL 2802713, at *9 (N.D. Ohio May 20, 2010); *Goins v. Astrue*, 2010 WL 55687, at *5 (N.D. Ohio Jan. 4, 2010).

If the five step sequential evaluation process, without removing the effects of substance abuse disorders from consideration, indicates that the plaintiff is not disabled then there is no need to

continue with the substance abuse materiality analysis of 20 C.F.R. §§ 404.1535 and 416.935. *Brueggemann*, 348 F.3d at 694-95 ("If the gross total of a claimant's limitations, including the effects of substance use disorders, suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent."). *See also Fastner v. Barnhart*, 324 F.3d 981, 986 (8th Cir. 2003); *Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001); *Wilby,* 2010 WL 2802713, at *9; *Schopplein v. Astrue*, 2008 WL 4568798, at *12 (E.D. Ky. October 14, 2008); *Williams*, 338 F. Supp. 2d at 863. Once the gross total of the plaintiff's exertional and non-exertional limitations, including the effects of her substance abuse, reveal that she is disabled, the adjudicator must determine whether her substance abuse is a "contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(a), 416.935(a).

The key factor in determining whether the plaintiff's substance abuse is a contributing factor material to her disability is whether she would still be disabled if she stopped using drugs or alcohol. 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1). To make that determination, the ALJ must "evaluate which of [the plaintiff's] current physical and mental limitations, upon which [he] based [his] current disability determination, would remain if [the plaintiff] stopped using drugs or alcohol and then determine whether any or all of [the plaintiff's] remaining limitations would be disabling." 20 C.F.R. §§ 404.1535(b)(2)(I)-(ii), 416.935(b)(2)(I)-(ii). If the plaintiff's remaining limitations are not disabling, then her substance abuse is a "contributing material factor to the determination of disability," but if the remaining limitations are disabling, then substance abuse is not a "contributing material factor to the determination of disability." 20 C.F.R. §§ 404.1535(b)(2)(I)-(ii), 416.935(b)(2)(I)-(ii).

Here, the ALJ determined that the plaintiff's polysubstance dependence was a severe impairment and that, including her substance use, the plaintiff's mental impairment met the criteria for Listing 12.04, depressive syndrome, and Listing 12.09, substance addiction disorder. (Tr. 14-15.) The ALJ found evidence of sleep disturbance and feelings of worthlessness in the plaintiff's Centerstone treatment records and found that she had marked limitations in social functioning and concentration, persistence, and pace. *Id.* However, the ALJ, relying in part on a diagnosis of alcohol dependence by Mr. Demarco (tr. 14, 331),[8] found that the plaintiff met the listed criteria "due to her substance usage." (Tr. 15.)

The ALJ then determined that, if the plaintiff stopped her substance use, she would no longer have a severe mental impairment.[9] (Tr. 15.) In making this determination, the ALJ evaluated the severity of the plaintiff's mental impairments if she stopped using substances using the "special technique" outlined in 20 C.F.R. §§ 404.1520a.[10] (Tr. 26-27.) In determining the plaintiff's

---

[8] Although the ALJ did not mention it here, Mr. Demarco also diagnosed the plaintiff with cocaine dependence. (Tr. 331.)

[9] The ALJ found that the plaintiff's physical impairments would remain severe. (Tr. 15.)

[10] The special technique is a series of steps delineated in subsections (b) through (e) of 20 C.F.R. § 404.1520a for assessing the severity of a mental impairment. As part of applying the special technique, the ALJ must rate the plaintiff's functional limitations in the following four areas, known as the "paragraph B" criteria: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). "If the ALJ rates the first three functional areas as 'none' or 'mild' and the fourth area as 'none,' the impairment is generally not considered severe and the [plaintiff] is conclusively not disabled." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009) (quoting 20 C.F.R. § 404.1520a(d)(1). If the impairment is severe, the ALJ "will then determine if it meets or is equivalent in severity to a listed mental impairment," and, if it does not, then the ALJ will move on to assess the plaintiff's RFC. 20 C.F.R. § 404.1520a(d)(2)-(3).

limitations according to the "paragraph B" criteria found at 20 C.F.R. § 404.1520a(c)(3), the ALJ found that the plaintiff would have mild limitations of the activities of daily living, noting that "[s]he took care of a woman for a short period due to the woman's illness;" "had no problems with her personal care;" "prepared her own meals;" and "did the laundry and washed dishes." (Tr. 15, 62, 174-75, 286.) The ALJ also found that the plaintiff would have mild limitations in social functioning, noting that she "continued to apply for work, attended church regularly, and went out window shopping" and that she "had a friend who took her places" and "spent time with others." (Tr. 15, 176-78, 286, 380.) Next, the ALJ found that the plaintiff would have mild limitations in the area of concentration, persistence, or pace because she "could drive, though she did not have a vehicle;" "needed no reminders to accomplish tasks;" "could pay bills, count change, handle a savings account, and use a checkbook;" "could concentrate on a television program;" "had never been fired or laid off from a job due to problems getting along with others;" and "got along with authority figures 'ok.'" (Tr. 15, 53, 175-77, 286.) Finally, the ALJ found that the plaintiff "would experience no episodes of decompensation if the substance use was stopped," noting that he could find no such episode in the record. (Tr. 16.)

After finding that the plaintiff's mental impairments would not be severe if she stopped using substances, the ALJ assessed the plaintiff's RFC if she "permanently stopped all substance use." (Tr. 16-20.) The ALJ found several physical limitations but did not include any mental limitations in the plaintiff's RFC, finding that "[i]f the [plaintiff] stopped using cocaine and all other substances for a prolonged period of time the undersigned is convinced that her symptoms and mental functioning would improve dramatically." (Tr. 18.)

In making this finding, the ALJ assessed the plaintiff's mental health treatment history and substance use in significant detail. The ALJ reviewed the plaintiff's consultative examination with Dr. Pettigrew during which she maintained a composed demeanor and euthymic affect; was well oriented with linear and organized thought; and had clearly articulated and fluent speech without pressured speech, flight of ideas, grandiosity, or tangentiality. (Tr. 19, 285-86.) The ALJ observed that Dr. Pettigrew "could detect no clinical evidence of current depression, and gave no mental diagnosis" but opined that the plaintiff "was able to understand, remember, and carry out simple verbal instructions." (Tr. 19, 286.) The ALJ also noted that the plaintiff testified that "she told Dr. Pettigrew that she did not have problems with drugs or alcohol because at the time she was not having a problem with drugs or alcohol." (Tr. 17.)

The ALJ also reviewed the plaintiff's treatment history with Centerstone, noting that she was treated for one year and "cancelled or failed to show up to 14 appointments." (Tr. 19, 323-415.) The ALJ noted that the plaintiff's initial intake assessment at Centerstone "was performed by a social worker" (i.e., Mr. Demarco) and that the plaintiff's "meetings with her case manager were largely related to her Social Security disability claim and appeal," including the plaintiff's reports that she was "feeling better" and "applying for jobs" but "did not want to risk 'messing up her chances for her disability'" by going back to work. (Tr. 19, 326-33, 346, 355, 364.) The plaintiff also told Centerstone staff members that "she no longer need[ed] case management services" and that "she had a tendency to stop taking her medications when she started feeling better." (Tr. 19, 346, 350.)

Of particular importance to the ALJ was the plaintiff's lack of credibility, especially with regard to her substance use.[11] The ALJ noted that the plaintiff testified:

> that she told her consultative examiner that she did not use alcohol, contrary to her medical records, because she had to tell providers she had a problem with alcohol in order to be seen. She stated that her actual problem was with cocaine. She testified that she told Dr. Pettigrew that she did not have problems with drugs or alcohol because at the time she was not having a problem with drugs or alcohol. When asked by the undersigned why she told Dr. Pettigrew that she had never used drugs or alcohol, she stated because she was scared and nervous. She testified that she stopped using cocaine in September 2011, and last used alcohol, one margarita, two weeks ago.

(Tr. 17-18.) Later, the ALJ found that "[t]here are so many contradictions in the record and with the [plaintiff's] testimony that it is difficult to give much credit to her allegations." (Tr. 20.) For example, the plaintiff "reported to Centerstone that she had been clean from cocaine and marijuana since 2007," yet, she "testified at her hearing that the last time she used cocaine was in September 2011." *Id.* These inconsistent reports led the ALJ to conclude:

> Overall it appears to me that the [plaintiff] has been deceptive about her cocaine addiction, trying to keep it under wraps or minimize it to her treating and examining sources, and, that any limitations she has experienced mentally has been due to her cocaine dependence. Her mental health treatment consisted of about one year seeing a case manager and being prescribed psychotropic medications that she was non-compliant with.

*Id.*

The Court concludes that the ALJ properly considered the plaintiff's substance use disorder and appropriately found that it was a contributing factor material to the determination of disability. First, the ALJ evaluated the gross total of the plaintiff's limitations, including the effects of

---

[11] The ALJ cited several other examples of inconsistent statements made by the plaintiff (tr. 20); however, the Court has focused here on the plaintiff's inconsistent statements regarding her substance use.

substance use disorder, and found that her mental impairments were disabling. The ALJ then determined that, if the plaintiff stopped the substance use, her mental impairment would no longer be disabling. The ALJ's conclusion in this regard is supported by the consultative opinions of Drs. Pettigrew, Sachs, and Neilson, finding at most mild limitations (tr. 284-301, 314) as well as the plaintiff's treatment history at Centerstone, which the ALJ characterized as "sporadic," and her lack of psychiatric treatment before April 2010 and after 2011. (Tr. 21.)

The plaintiff argues that Mr. Demarco's April 15, 2010 CRG assessment, in which he opined that she had marked limitations, was completed at a time in which she was in full sustained remission. Docket Entry No. 14-1, at 10. Thus, she contends that the limitations identified by Mr. Demarco reflect her true functional ability when not impaired by substance use. *Id.* However, at the plaintiff's intake assessment on April 15, 2010, Mr. Demarco diagnosed her with alcohol and cocaine dependence (tr. 331), and any indication that she was in full sustained remission came from the plaintiff's own reports. It is well established in the record that the plaintiff routinely misled treating and non-treating sources regarding her drug and alcohol use. Despite her reports to Centerstone that she was in remission, the plaintiff testified at the hearing that she did not stop using cocaine until September 2011 and last used alcohol two weeks before the hearing. (Tr. 54.) It was reasonable for the ALJ to question the veracity of the plaintiff's claims that she was not using drugs or alcohol at the time Mr. Demarco completed the CRG assessment.

Similarly, it was reasonable for the ALJ to question whether the plaintiff had stopped using drugs and alcohol at the time of the hearing. The plaintiff contends that, per her testimony, she had not used cocaine since September 2011, over one year prior to her hearing on October 18, 2012. Docket Entry No. 14-1, at 7-8. She contends that the ALJ should have obtained a urine drug screen

and that, without such evidence, his conclusions regarding her drug use were unfounded. *Id.* The plaintiff does not cite any authority requiring the ALJ to obtain a urine drug screen before determining that the plaintiff's substance use contributed to her disability. Moreover, a drug screen was not necessary because the ALJ based his conclusion on the plaintiff's own testimony that her substance use continued during the relevant period of disability. Given the plaintiff's testimony, her treatment history, and the numerous times she inaccurately represented her drug and alcohol use, it was reasonable for the ALJ to find that substance use was a contributing factor material to the determination of disability.

### 3. The ALJ properly considered the plaintiff's obesity.

The plaintiff argues that the ALJ did not properly consider her obesity when determining her RFC. Docket Entry No. 14-1, at 12-13.

Social Security Ruling ("SSR") 02-01p, which details the Social Security Administration's ("SSA") policy on obesity, provides that, even though the SSA no longer classifies obesity as a listed impairment, adjudicators must still consider its effects when evaluating an individual's RFC. Soc. Sec. Rul. 02-01p, 2002 WL 34686281, at *1. Accordingly, SSR 02-01p provides that:

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time . . . [O]ur RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

*Id.* at *6.

The Sixth Circuit has held that SSR 02-01p does not offer "any particular procedural mode of analysis for obese disability claimants." *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 443 (6th Cir. Aug. 12, 2010) (quoting *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 412 (6th Cir. Jan. 31, 2006)). Rather, it provides that "obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Id.* (quoting *Bledsoe*, 165 Fed. Appx. at 412). However, obesity should be evaluated on a case by case basis because it "*may or may not* increase the severity or functional limitations of the other impairment." Soc. Sec. Rul. 02-01p, 2002 WL 34686281, at *6 (emphasis added). An ALJ's explicit discussion of the plaintiff's obesity indicates sufficient consideration of her obesity. *See Coldiron*, 391 Fed. Appx. at 443. The Sixth Circuit has also held that an "ALJ does not need to make specific mention of obesity if he credits an expert's report that considers obesity." *Bledsoe*, 165 Fed. Appx. at 412 (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

The plaintiff testified that she is 5'10" tall and weighs 338 pounds. (Tr. 52.) The ALJ included morbid obesity as a severe impairment and noted that the record contained diagnoses of "massive morbid obesity." (Tr. 14, 18.) The ALJ evaluated whether the plaintiff's obesity, in combination with her other impairments, met or equaled a listed impairment and determined that it did not. (Tr. 16.) The ALJ also considered the plaintiff's obesity in the context of her RFC assessment. Specifically, the ALJ gave significant weight to the opinion of Dr. Huang, who found that the plaintiff's "severe degenerative joint disease of her knees was related to her morbid obesity." (Tr. 19, 282.) However, even after considering the plaintiff's obesity, Dr. Huang nevertheless opined that she was capable of lifting twenty pounds occasionally and ten pounds frequently, standing and/or walking 3-4 hours in an eight-hour workday, and sitting five hours in an eight-hour workday.

*Id.* The ALJ's RFC determination is consistent with Dr. Huang's opinion. (Tr. 16, 20, 282.) The ALJ's decision demonstrates that he appropriately considered the plaintiff's obesity and the extent to which her obesity, in combination with other impairments, limited her overall functional ability.

## IV. RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 14) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. See *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge